# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 12-8688-GW(JEMx) | Date | October 21, 2013 |
| Title | *Goodness Films, LLC, et a.l v. TV One, LLC, et al.* | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Pat Cuneo | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Alpheus R. Hamrick, III | James Timothy Ryan |
| Rebecca Lynn Worden | Michael O. Azat |
| James M. Pazos | Sarah Erickson Andre |
| | Miguel Nunez, Jr., pro se |
| | Nicholas Allen Kurtz |

**PROCEEDINGS:**   **DEFENDANT TV ONE, LLC'S MOTION FOR SUMMARY JUDGMENT [178];**

**DEFENDANT ED. WEINBERGER'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT [181]**

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, Defendants' Motions are TAKEN UNDER SUBMISSION. Court to issue ruling.

| | | : | 26 |
|---|---|---|---|
| | Initials of Preparer | JG | |

**_Goodness Films, LLC, et al. v. TV One LLC, et al._**; Case No. CV-12-8688-GW(JEMx)
Tentative Ruling on: (1) Defendants' Motion for Summary Judgment and (2) Defendants
Weinberger and Nunez's Motion for Summary Judgment

## I. Background

    Goodness Films, LLC ("Goodness Films") and individuals Herbert Hudson ("Hudson"), Paul
Goldsby and Kennedy Goldsby (collectively, "Plaintiffs") filed suit against TV One, LLC ("TV
One") and individuals Miguel A. Nunez, Jr. ("Nunez") and Edwin B. Weinberger ("Weinbger")
(collectively, "Defendants") in October of 2012. *See generally* Docket No. 1. Plaintiffs allege that
Defendants Nunez and Weinberger conspired to plagiarize materials for Plaintiffs' proposed
television series, Roscoe's House of Chicken and Waffle's ("Roscoe's Show"), and then pitched the
copied materials under the title "Belle's" to Defendant TV One, a television network. *Id.*

    Plaintiff Hudson founded the Southern California-based soul food restaurant Roscoe's
Chicken & Waffles ("Roscoe's Restaurant") in 1975.[1]  Hudson and Paul and Kennedy Goldsby
eventually began to develop the idea for a television series or feature film based on Roscoe's
Restaurant. *See, e.g.,* Statement of Genuine Disputes ("SGD"), Docket No. 208, ¶¶ 2, 5 14-15. In
2004, Plaintiffs discussed the specific possibility of creating a television series entitled "Roscoe's
Show", which was "conceived as a situation comedy that highlighted Roscoe's [R]estaurant, its
memorable employees, and the interactions among the 'unique people who work and dine there.'
SGD ¶ 16. Plaintiff Kennedy Goldsby began work on a script for Roscoe's Show. *Id.* ¶ 2. Over the
next several years, Plaintiffs began actively seeking to identify and engage industry insiders for
involvement with Roscoe's Show. In 2005, Plaintiffs claim that they approached Defendant Nunez,
an actor, about the possibility of playing the role of "Darrell," a simple minded restaurant employee
whose mishaps wreak havoc on his employer. Docket No. 67 at 3.[2]  Plaintiffs allege that Nunez
thereafter introduced them to Defendant Weinberger, an individual with contacts in the entertainment
industry, who Plaintiffs envisaged might serve as a writer for Roscoe's Show. *Id.* Kennedy
Goldsby, in the meantime, continued to work on the pilot script, character bible, and "treatment' (or
synopsis) for Roscoe's Show (collectively, the "Roscoe's Show materials"), all of which were
eventually approved by Hudson in 2007. *Id.*[3]  During this period, Plaintiffs claim that Defendant

---

[1]The Court's summary of the facts in this case are drawn from Plaintiffs' Statement of Genuine Disputes
("SGD"), which incorporates Defendants' Statement of Undisputed Facts and Plaintiffs' responses thereto, as well as
the Court's prior orders and exhibits attached to Defendants present motions. *See generally, e.g.,* SGD, Docket No.
208. Where the parties dispute a given issue of material fact relevant to resolving the instant motion, those disputes
are addressed in this Order.

[2]Page umber references to Docket Numbered documents are to the CM/ECF stamped numbers at the top of
each page (*i.e.* "Page 3 of 20"), and *not* to the page number at the bottom of the original document.

[3]In 2009, Paul Goldsby and Hudson formed a television production company, Plaintiff Goodness Films, to
which they assigned the rights to both Roscoe's Show and "all rights to use the Roscoe's House of Chicken and
Waffels name," as well as the registered copyright. *See* Docket No. 65-1, Ex. A. For ease of reference, the Court
refers to Plaintiffs collectively, unless discussing the actions of one or more specific individual Plaintiffs.

Nunez also had access to the Roscoe's Show materials. *Id.*

Between 2009 and 2012, Plaintiffs continued to develop Roscoe's Show and held various casting sessions and meetings with members of the entertainment industry in an effort to bring the show to a potential audience. *See, e.g.,* SGD ¶¶ 118-123; Docket No. 67 at 3. While the parties dispute the precise nature of the events that occurred during this period, Plaintiffs maintain that Weinberger attended at least some of these casting sessions, had access to the Roscoe's Show materials, and ate and took notes for the project at Roscoe's Restaurant on many occasions between 2009 and 2010. Docket No. 67 at 4.[4] At some point in 2011, Plaintiffs claim that they met with Defendants Nunez and Weinberger to discuss the setting for Roscoe's Show. *Id.* Later that year, Plaintiffs identified Defendant TV One – a television channel primarily owned by Radio One and NBC Universal – as an ideal target for premiering Roscoe's Show, and claim that they asked Nunez to approach his connections and present the project to the network. *Id.* Plaintiffs assert that, around the same time, they also held negotiations with Weinberger related to his involvement with Roscoe's Show, and assert that their agreement with Weinberger obligated him to present Roscoe's Show with Nunez to TV One. SGD ¶ 88. Plaintiffs refused to give Weinberger an equity stake in the show, however, and claim that Weinberger eventually become frustrated with the lack of progress in the development of the series. Docket No. 67 at 4. At one point, Weinberger purportedly stated words to the effect of "We don't need Herb [Hudson]. We could take [Roscoe's Show] to TV One ourselves, and I would write it for free." SGD ¶ 89.

Sometime thereafter, Plaintiffs assert that Weinberger and Nunez implemented a scheme to steal integral portions of Roscoe's Show and create a television situation comedy entitled Belle's. *See, e.g.,* SGD ¶¶ 102, 104; Docket No. 93-1 ¶ 52. Weinberger and Nunez then allegedly pitched the production of Belle's to TV One, after which TV One agreed to develop and air the show on its network. Docket No. 93 ¶¶ 54-55. In February of 2013, TV One aired the first two episodes of Belle's, and after the premier date a total of at least five episodes were broadcast. *Id.* ¶ 72. Plaintiffs' operative Fourth Amended Complaint asserts claims for: (1) copyright infringement against all Defendants; (2) "vicarious liability for copyright infringement" against TV One; (3) "contributory copyright infringement" against TV One; (4) breach of fiduciary duty against Nunez; (5) aiding and abetting breach of fiduciary duty against Weinberger; (6) breach of implied-in-fact contract against Nunez and Weinbger; and (7) interference with prospective business advantage by Nunez and Weinberger. *See* Docket No. 93-1 ¶¶ 73-123.

On September 23, 2013, Defendants TV One, Weinberger, and Nunez[5] filed the instant motions for summary judgment, arguing that Plaintiffs cannot establish a genuine issue of material fact with respect to any of their seven claims. *See* Docket Nos. 178-1, 181. For the reasons delineated below, the Court would GRANT IN PART and DENY IN PART Defendants' motions.

## II. Legal Standards

Summary judgment shall be granted when a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[4] The parties do not dispute that Defendants had access to the Roscoe's Show materials.

[5] Defendant Nunez joined TV One and Weinberger's motions for summary judgment. *See* Docket No. 196.

56(a). In other words, summary judgment should be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798-99 (9th Cir. 2010).

To satisfy its burden at summary judgment, a moving party *without* the burden of persuasion – such as Defendants here – "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). *See also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.' ") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and citing *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) (holding that the *Celotex* "showing" can be made by "pointing out through argument … the absence of evidence to support plaintiff's claim")). Further,

> [i]f the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal citations and quotation marks omitted). At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and views all evidence and draws all inferences in the light most favorable to the non-moving party. *See id.* at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hrdlicka v. Reniff*, 631 F.3d 1044 (9th Cir. 2011); *Motley v. Parks*, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (en banc); *Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005).

## III. Analysis

Defendants TV One, Weinberger and Nunez all move for summary judgment on Plaintiffs' copyright claims, arguing that Belle's and the Roscoe's Show are not substantially similar and thus Plaintiffs cannot establish copyright infringement as a matter of law. Defendants Weinberger and Nunez separately argue that summary judgment is warranted on Plaintiffs' state law claims for breach of fiduciary duty, breach of implied contract, and interference with prospective economic advantage. The Court will thus first address Plaintiffs' copyright claims and then proceed to Plaintiffs' remaining claims under California law.

### A. The Copyright Claims

Plaintiffs argue that because Defendants had significant direct access to the Roscoe's Show materials, the objective similarities between Belle's and Roscoe's Show are sufficient to satisfy the "extrinsic test" of copyright infringement. Docket No. 202 at 17-19. Plaintiffs assert that Roscoe's

and Belle's contain "undeniable" similarities between key characters, their soul food restaurant settings, their comedic plots and sequences of events, as well as their "punchy" and "provocative" pace and mood. *Id.* at 20-32. Plaintiffs further argue that even if some aspects of Roscoe's Show are unprotectable in isolation, the particular sequence of these elements is so similar to Belle's that the Court must deny Defendants' motion for summary judgment. *Id.* at 18-19 (citing *Metcalf v Bocho*, 294 F.3d 1069 (9th Cir. 2002)).

In order to state a claim for copyright infringement, a plaintiff must allege (1) ownership of a valid copyright, and (2) actionable copying by the defendant of constituent elements of the work that are original. *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The second prong requires Plaintiffs to allege that "the infringer had access to plaintiff's copyrighted work and that the works at issue are substantially similar in their protected elements." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). Defendants do not dispute the validity of Plaintiffs' copyright.

The Ninth Circuit has summarized the "substantial similarity" test for copyright infringement as follows:

> The substantial-similarity test contains an extrinsic and intrinsic component. At summary judgment, courts apply only the extrinsic test; the intrinsic test, which examines an ordinary person's subjective impressions of the similarities between two works, is exclusively the province of the jury.... A "plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." ....
>
> Extrinsic analysis is objective in nature. "[I]t depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed." . . . . The extrinsic test focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the two works. . . . In applying the extrinsic test, this court "compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." ....
>
> "[P]rotectable expression includes the specific details of an author's rendering of ideas." . . . However, scenes à faire, which flow naturally from generic plot-lines, are not protectable. . . . We "must take care to inquire only whether 'the protectable elements, standing alone, are substantially similar.'"

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006) (citations omitted).

Thus, summary judgment against Plaintiffs is warranted if and only if Defendants demonstrate that there is no substantial similarity under the extrinsic analysis. Both parties thus properly structure their briefs by discussing each of the factors involved in that determination: plot,

-4-

themes, dialogue, mood, setting, pace, characters, and sequence of events. The Court will consider the degree of similarity between Belle's and the Roscoe's Show by examining each of these elements in turn. *See Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir. 1985) ("The extrinsic test compares the individual features of the works; it looks to find specific, articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events."); *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1112 (N.D. Cal. 2010) ("The Court examines each of these criteria in turn [when ruling on a motion to dismiss a copyright claim]"). Importantly, though, "[u]nder the 'inverse ratio' rule, if a defendant had access to a copyrighted work, the plaintiff may show infringement based on a *lesser degree of similarity* between the copyrighted work and the allegedly infringing work." *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010) (emphasis added).

### 1. Plot/Sequence of Events

Two works are not substantially similar even if they "share the same basic plot premise, [if] a closer inspection reveals that they tell very different stories." *Benay*, 607 F.3d at 625. Basic plot ideas are not protectable by copyright law, nor are stories that directly flow from basic stock plot ideas. *See Campbell*, 718 F. Supp. 2d at 1112-13 ("the Court finds this young mentee-older mentor storyline to be a 'basic plot idea . . . not protected by copyright law.' . . . The idea that the older mentor is a former champion racer 'directly flows' from the racing storyline.") (citations omitted). Here, as this Court has previously explained, while there are some undeniable similarities in terms of the basic plot premise of a restaurant serving as a diverse community meeting-place, the Court would find that the Roscoe's Show and Belle's tell two different stories:

> **Belle's Plot**: After Belle, an African-American matriarch, dies, her family continues running the upscale Atlanta soul food restaurant she made famous. One day, a white man named Tucker Crawford comes into the restaurant and asks if he can host his family reunion there, as he had enjoyed a meal he had recently eaten at the restaurant. He puts down a large deposit, and the family is excited. Mr. Crawford, though, also flirts with Elese, one of Belle's daughters, who seeks to make a name for herself as a model, and Mr. Crawford promises to help her. The family grows less disillusioned with Mr. Crawford when they seemingly discover that his family used to own members of Belle's family as slaves on a plantation. The restaurant owner and Belle's widower, Bill, grows incensed, and vows to refuse to host the Crawford family reunion no matter what price the "Crawford Clan" had committed to pay. In the midst of his angry interaction with Mr. Crawford about the matter, though, he is introduced to another Crawford Clan member, an African-American judge, also the Crawford family historian, who provides details about how the white Crawford's past relationship with African-Americans and Belle's family in particular is not nearly as dastardly as it had initially appeared. After some hilarity and confusion, all come to realize that Belle's will be the perfect location for the multi-cultural Crawford Clan's reunion. This is lucky, as Bill's strong-minded and sassy sister-in-law Gladys, the restaurant cook, needs a new burner for the stove, and the Crawford Clan reunion will help fund that repair.

**Roscoe's Plot**: Sam is the entrepreneurial and stubborn owner of an eclectic homestyle Los Angeles restaurant. His bumbling employee Darell informs him that the tires on the wheels the store's van need to be replaced, which irks Sam. Paco, the jittery Mexican cook, has gone on a few dates with one of the restaurant's lady customers, whom he suddenly fears is actually a man. A couple of customers appear to be in the midst of a wedding proposal, but it turns out that the girl has other ideas in mind; the waitresses amuse themselves by gossiping about the situation. The customers briefly discuss issues such as race, African poverty, Hispanic immigration difficulties and relationship turmoils. Darell bungles the tire repair and ends up totaling the van - the day after the insurance had lapsed. Wanda, a sexy waitress, encounters various romantic complications, and strives to get ahead in the world. Meanwhile, Sam becomes irate that a local white politician, Senator Weir, appears to be shaking him down for cash in a corrupt manner, but it turns out to have been a misunderstanding as the Senator was only "barnstorming," *i.e.* asking for Sam's legitimate support for his reelection campaign.

In their Opposition to Defendants' motion for summary judgment, Plaintiffs emphasize the purportedly "striking," specific plot similarities between the two works, such as the fact that both Sam and Bill are asked for input on financial decisions involving the operation of the restaurant; the fact that characters in both shows are involved in minor romantic interactions with restaurant patrons; the fact that both shows include a discussion of a need to repair certain items "essential" to the restaurant; and the fact that both Darell and Maurice encourage confrontation with various characters before fully understanding the facts. Docket No. 202 at 26-27. Belle's and Roscoe's Show also both involve restaurant owners who have a misapprehension that a white man (Mr. Crawford in Belle's and Senator Weir in the Roscoe's Show) is trying to pull one over on them, and end up being in the wrong, to their sheepish chagrin. Both shows also involve a lovable but incompetent employee – Maurice (the bartender) in Belle's and Darrell in Roscoe's Show – as well as attractive females – Elese and Wanda – who strive for something other than what they presently have in life, and have no shame in using their looks to achieve that goal.

"At first blush, these apparent similarities in plot appear significant; however, an actual reading of the two works reveals greater, more significant differences and few real similarities[.]" *Funky Films*, 462 F.3d at 1078.[6] Here, upon closer examination – and as the Court noted in its

---

[6]In *Funky Films*, the Ninth Circuit determined that the following plot similarities were insufficient – when compared to an actual reading of the two works – to create a triable issue of material fact:

> According to appellants, both works concern "a narrative about a small funeral home, and the lives of the family members who operate it"; plot-lines involving "the death of the father . . . [who] has for decades run the business"; a father whose death is "unexpected and not attributable to natural causes" (suicide in "The Funk Parlor" and a car accident in "Six Feet Under"); and the presence of "two sons" who receive equal shares of the business, with the "older son . . . liv[ing] in a distant city, working outside the funeral industry." In both works, the older son initially "has no interest in becoming involved with the funeral business"; moreover, "[t]he family business is financially fragile, and in both works the funeral home is pointedly shown to be in debt and operating out of a substandard facility with obsolete equipment and a hearse that stalls."

previous ruling – the plot and sequence of events in the two television shows are clearly different. *See generally* Docket No. 67. In Belle's, the episode centers almost exclusively on Tucker Crawford's offer to rent out the restaurant and the racial tensions brought about by the offer, as well as the family dynamic more generally in the wake of Belle's death (her portrait hangs in the restaurant, and she appears to look down on the proceedings sagely). Belle's is a relatively linear, straightforward plot framed by way of a flashback from Pam, the ten year-old granddaughter of Belle. The Roscoe's Show instead is nonlinear, presenting a comedic portrait of a bustling casual restaurant, and the sequence of events largely concerns the romantic entanglements of the staff (who are not a family) and the amusing antics of hapless employee Darell. The plots and sequences of events as between the two shows are thus not substantially similar. *See Gilbert v. New Line Prods., Inc.*, No. CV 09-02231 RGK (RZx), 2010 U.S. Dist. LEXIS 141516, at *15-16 (C.D. Cal. Aug. 13, 2010) (plot of works not similar because "Plaintiff's plot . . . features more characters and contains several subplots . . . Defendants' screenplay does not have these comparable subplots, focusing almost exclusively on [one] relationship").

Indeed, even the specific examples of "similarities" identified by Plaintiffs are, when scrutinized more carefully, not particularly compelling. For example, while the two restaurant owners in both shows are confronted with financial decisions affecting the restaurants, those decisions differ significantly. In Belle's, Bill's decision relates to the cost of replacing kitchen stovetops and, in the context of the overall plot, is not especially significant, as the discussion of the issue is relegated primarily to a few lines at the beginning of the show. In Roscoe's Show, by contrast, Sam's decision relates to the cost of obtaining insurance for a van which, in arguably the most dramatic scene of the episode, is ultimately totaled by Darell before the new insurance is purchased. Thus, while at a general level Plaintiffs are correct insofar as both Sam and Bill are asked for input on financial decisions involving the operation of the restaurant, that similarity – and others like it – are "insufficient to constitute the type of congruence of plot relevant to the substantial similarity analysis." *Olson v. Nat'l Broad Co., Inc.*, 855 F.2d 1446, 1450 (9th Cir. 1988) (noting that "The A-Team" and "Cargo" were somewhat similar in terms of theme, mood, pace, and characters, but concluding that such similarities were "common to the genre of action-adventure television series," "lightly sketched," and insufficient to establish substantial similarity under the extrinsic test); *see also Funky Films*, 462 F.3d ("At a very high level of generality, both works share certain plot

------

Both works also contain an attempt by a "rival funeral home," spearheaded by "the female principal of the rival business" to "take[ ] advantage of their vulnerable financial condition," "bluntly mak[ing] a lowball offer" and "approaching one of the brothers at the father's funeral with a proposal to buy the family business." In both works, the older brother initially "expresses his desire to sell" but "changes his mind and commits himself to help his brother keep the business afloat." Finally, appellants point out the older brother's creativity, which stands in "pointed contrast to the leaden conservatism of the younger brother"; that the funeral home in both works is used as a "site for musical entertainment"; that the "younger brother . . . change[s] his church affiliation in order to increase their client base" in both works; and that "the rival's takeover attempt does not succeed."

*Funky Films*, 462 F.3d at 1077-78 (alterations in original).

similarities: the family run funeral home, the father's death, and the return of the 'prodigal son,' who assists his brother in maintaining the family business. But '[g]eneral plot ideas are not protected by copyright law; they remain foreever the common property of artistic mankind.") (alteration in original) (citation omitted).[7]

### 2. Themes

Plaintiffs argue that the themes are similar because both works "examine the varied and meaningful connections between employees and clientele, at restaurants which bring together those of diverse backgrounds, who might never have otherwise crossed paths." Docket No. 202 at 28. Plaintiffs further claim that Belle's and Roscoe's Show "look at common human struggles such as identity, ambition, and romance" while simultaneously presenting "a comedic approach to the weightier issues that all humankind faces." *Id.* Finally, Plaintiffs emphasize that both shows cover these themes against the backdrop of restaurants offering a mix of familiarity and unpredictability designed to appeal to a variety of viewers. *Id.*

Plaintiffs arguments on this point are equally unavailing. As the Court has noted in the past, while both works touch on the connections that form between people whose paths cross at a restaurant, a finding of substantial similarity is not warranted as to this prong of the extrinsic test, because "the works develop those themes in very different ways." *Benay*, 607 F.3d at 627. In Belle's, the restaurant's melting-pot characteristic engenders family cohesion, as Belle's family bond upon learning of both their error as to the true history of their family's long-ago interactions with the Crawford Clan. The Roscoe's Show, by contrast, largely focuses on the social and professional aspirations of the characters, and entirely lacks the family bonding component that is central to the restaurant's vibe and the show's theme in Belle's. Thus, there is no substantial similarity, as the shows' themes and stories diverge from one shared, unprotectable idea of a restaurant setting. *See Funky Films*, 462 F.3d at 1079 ("Although both works explore themes of death, relationships, and sex, they do so in very different ways."); *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 838 (C.D. Cal. 2010) (finding no thematic similarity because "The ideas of righting past wrongs and good things happening to good people are general storylines that have been around for thousands of years. These ideas, standing alone, are not protectable.") (citing *Olson*, 855 F.2d at 1450).

### 3. Dialogue

To support a claim of substantial similarity based on dialogue, the plaintiff must demonstrate "extended similarity of dialogue." *Olson*, 855 F.2d at 1450. As previously explained by the Court,

---

[7]The Court would reject Plaintiffs' contention that the Court already decided that there were genuine issues of material fact on the copyright claims when ruling on Plaintiffs' motion for a preliminary injunction and Defendants' first motion to dismiss. Needless to say, the standards for a preliminary injunction or motion to dismiss differ significantly from those applicable to a motion for summary judgment. Moreover, in its initial ruling, while the Court did not extensively analyze the *unprotected* elements of Roscoe's Show, it nevertheless concluded that Plaintiffs were unlikely to succeed on the merits because "the similarities between Belle's and the Roscoe's Show do not, even in the aggregate, amount to anything akin to the striking similarities between the works at issue in *Metcalf*, and are much more generalized[.]" *See* Docket No. 67 at 18. Even assuming the Court already reached such the conclusion urged by Plaintiffs, "interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment[.]" *Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996) (citation omitted).

there is basically no similarity between the dialogue in Belle's and that used in the Roscoe's Show script. Defendants correctly point out that the Roscoe's Show makes much use of slang words such as "dude" and "sista'", whereas the Belle's staff and customers speak in a more formal and polished way. Docket No. 178-1 at 20-21. These differences preclude a finding of substantial similarity as to dialogue. *See Gilbert v. New Line Prods.*, No. CV 09-2231-RGK, 2010 U.S. Dist. LEXIS 141516 , at *24-25 (C.D. Cal. Aug. 13, 2010) (finding no similarity as to dialogue because "Plaintiff's screenplay . . . frequently uses expletives in daily conversation . . . whereas Defendants' characters use virtually none.") *vacated in part on other grounds*, 490 Fed. Appx. 34, 37 (9th Cir. 2012); *see also Gable*, 727 F. Supp. 2d at 847 (finding no similarity as to dialogue because "hard-core street vernacular . . . has no counterpart in [Defendant's work, which is] . . . principally sarcastic and witty. Every serious thought is followed up with a humorous quip, geared toward keeping the mood of the series light."). While the Roscoe's Show script contains four lines pertaining to race, which essentially consists of a cynical joke,[8] the Belle's dialogue pertaining to race is far more detailed and thoughtful. In sum, the works have little similarity as pertains to dialogue.

### 4. Pace

As for pace, the Roscoe's Show is a whirlwind adventure told through snippets of conversation among a multitude characters, whereas Belle's features longer scenes with poignant moments among a smaller subset of characters. There is little similarity between the casual, fast-paced Roscoe's Show's pace or dialogue, as compared with the more sentimental and measured Belle's.

### 5. Mood

The two shows also display very different moods. Belle's features numerous bittersweet moments, such as when the family gazes at the portrait of the deceased Belle, or when Bill laments the horrors of slavery (albeit in a light-hearted manner). The use of Pam, a pre-teen member of the Belle's family, as narrator, also lends Belle's a sentimental air that is absent in the slightly grittier Roscoe's Show, which is more of a madcap screwball comedy. There is thus little similarity between the works with respect to mood. *See Campbell*, 718 F. Supp. 2d at 1114 (finding the mood of two works not similar when one has "happy, upbeat overtones" and the other "contains violent overtones").

### 6. Setting

Given the fact that Plaintiffs' sufficiently allege Defendants had access to the Roscoe's Show Materials, and thus bear a lower burden of showing similarity, this element weighs in favor of Plaintiffs by virtue of the fact that both shows take place at soul food restaurants with eclectic and multicultural clientele. While Defendants make much of the fact that the Roscoe's Show script, unlike the Belle's pilot, contains scenes outside the four walls of the restaurant, the fact remains that both shows undeniably center around a bustling community-oriented restaurant. Nonetheless, Defendants correctly point out that Roscoe's Show is premised on an *actual* restaurant in Los

---

[8]Docket No. 22, Ex. A at 16 ("OLD MAN: [t]he last time black people got together to get anything done, they had to be chained together first.").

Angeles, whereas Belle's is premised on a purely fictional restaurant in Atlanta. Overall, given the parties' previous collaboration on a restaurant-themed television project, the Court would find that Plaintiffs have demonstrated some degree of similarity on this element. *Cf. Benay*, 607 F.3d at 628 ("Some of the settings are strikingly dissimilar. . . . The Screenplay opens at West Point with a classroom scene, a snowball fight, and a scene in Gamble's comfortable home. The Film, on the other hand, opens at a San Francisco convention hall where the drunk Algren is hawking Winchester rifles."). Unfortunately for Plaintiffs, however, these similarities – such as soul food restaurants and multicultural clientele – are not subject to copyright protection. *See Funky Films*, 462 F.3d at 1080 (finding no similarity "[a]lthough both works take place in a contemporary, family-run funeral home[.]").

### 7. Characters

There are several undeniable similarities between some of the characters in Belle's and the Roscoe's Show. The Court would conclude that the following pairs of characters are inescapably similar at least in certain respects, especially given that Plaintiffs have properly alleged that Defendants had access to the Roscoe's Show Materials:

> **Bill/Sam**: In Belle's, we meet Bill, a crotchety but lovable, hardworking and respectable restaurant owner who is also stubborn and grouchy. In Roscoe's Show, we meet essentially the same character, named Sam, though he is considerably less dapper, given his more modest restaurant surroundings.

> **Gladys/Momma**: Plaintiffs accurately summarize the similarities between these characters: "Both Momma and Gladys are characterized as no-nonsense women who perform their duties at the restaurants with skill derived from years of experience." Docket No. 53 at 12. Moreover, both women have a bossy, wise tone that makes the other staff members respect them, while maintaining a warm, maternal affect. That this character may be pandemic in African-American sitcoms does not vitiate the fact that the two characters are similar.

However, while some of these traits unquestionably overlap, "[g]eneralized character types are not protected by copyright law," *Bernal v. Paradirm Talent and Literary Agency*, 788 F. Supp. 2d 1043, 1069 (C.D. Cal. 2010) (citation omitted), and even these four characters with the *most* significant similarities in Roscoe's Show and Belle's do not share the "especially distinctive" traits necessary for a finding of substantial similarity. *Olson*, 855 F.2d at 1452; *see also Ets-Hotkin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) ("The less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.").[9]

---

[9] The Seventh Circuit's description of unprotectable stock characters is enlightening:

A stock character is a stock example of the operation of the [scenes á fair] doctrine, and a drunken old bum is a stock character. If a drunken old bum were a copyrightable character, so would be a drunken suburban housewife, a gesticulating Frenchman, a fire-breathing dragon, a talking cat, a Prussian officer who wears a monocle and clicks his heels, a masked magician, and, in Learned Hand's memorable paraphrase of

In essence, the character traits of Bill and Sam, for example, flow naturally from the role of an older, stubborn yet endearing manager, boss, or patriarch. And while Gladys and Momma could both be described as wise, supportive, and insightful, such traits are likewise insufficiently distinctive to warrant copyright protection. The other character pairings, while superficially similar, actually have little in common, such as Roscoe's bumbling Darell as compared with distracted playboy Maurice in Belle's, not to mention Roscoe's Wanda, who has little more in common with Belle's Elese than the fact that both women are strikingly attractive and know it. *See Gable*, 727 F. Supp. 2d at 845 (finding no similarity between characters when "Like Tori Ann, Joy is also in her twenties, is attractive, and has a sarcastic attitude. Other those general [unprotectable] character traits, however, the women have little in common."). Belle's also contains many characters that do not line up to any characters in the Roscoe's Show, notably pre-teen narrator Pam.

In sum, for the reasons explained above, the Court would find that the two works are not substantially similar. While Plaintiffs are correct that the shows contain some general similarities, these similarities are insufficient to pass the extrinsic test for copyright infringement. Even assuming Defendants developed Belle's by using Plaintiffs' ideas, copyright protection extends only to the specific details of an author's rendering of ideas. *Funky Films*, 462 F.3d at 1077 (the court must "take care to inquire only whether 'the protectable elements, standing alone, are substantially similar.'"); *see also See v. Durang*, 711 F.2d 141, 142 (9th Cir. 1983) ("[c]opying deleted or so disguised as to be unrecognizable is not copying."); *Warner Bros., Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 241 (2d Cir. 1983) (A defendant that actually uses a plaintiff's work "may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's."). Because there is no genuine dispute that Belle's does not infringe the Roscoe's Show materials, the Court would GRANT Defendants' motions for summary judgment on all of Plaintiffs' copyright claims.

Plaintiffs' state law claims, however, are a different matter.

## B. The State Law Claims

Defendants Weinberger and Nunez argue that Plaintiffs have also failed to establish any genuine issues of material fact with respect to their claims under California state law. *See generally* Docket No. 181. For the reasons delineated below, the Court would disagree and would DENY Defendants' motion for summary judgment on the state law claims.

### 1. The Fiduciary Duty Claims

Defendants first argue that Nunez owed no duty to Plaintiffs because he was never authorized to alter Plaintiffs' legal relationships with TV One and because Nunez was never controlled by Plaintiffs. Docket No. 181 at 24-25. Defendants next claim that because Plaintiffs never trusted Nunez, he cannot have served as Plaintiffs' agent. *Id.* Given that TV One rejected other pitches of

---

Twelfth Night, 'a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress.' It would be difficult to write successful works of fiction without negotiating for dozens or hundreds of copyright licenses, even though such stereotyped characters are the products not of the creative imagination but of simple observation of the human comedy.

*Gaiman v. McFarlane*, 360 F.3d 644, 660 (7th Cir. 2004).

Roscoe's Show, "Plaintiffs can never demonstrate that Nunez would have fared any better" and, therefore, Defendants assert that Plaintiffs cannot establish causation. *Id.* Because Plaintiffs purportedly cannot make out a breach of fiduciary duty claim – and because Weinberger had no "knowledge of Plaintiffs' discussions with Nunez regarding Roscoe's Show" – Defendants argue that the claim for aiding and abetting breach of fiduciary duty must likewise fail. *Id.*

Under California law, the elements of a cause of action for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach. *Amtower v. Photon Dynamics, Inc.*, 158 Cal. App. 4th 1582, 1599 (2008). Aiding and abetting liability "may properly be imposed on one who knows that another's conduct constitutes a breach of duty and substantially assists or encourages the breach." *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1133-34 (C.D. Cal. 2003). "The existence of agency or employment is mainly a question of fact." 3 Witkin, Summary of Cal. Law: Agency & Employment, § 93, p. 140; *see also ING Bank, FSB v. Chang Seob Ahn*, 758 F. Supp. 2d 936, 941 (N.D. Cal. 2010) ("Agency is typically a question of fact[.]"); *Van't Rood*, 113 Cal. App. 4th at 562 (2003) (same); *Borders Online*, 129 Cal. App. 4th at 1189 ("It is true that '[t]he existence of an agency relationship is usually a question of fact, *unless the evidence is susceptible of but a single inference*.'") (citation omitted) (emphasis in original). "[W]here the evidence is undisputed, the issue becomes one of law." 3 Witkin, Summary of Cal. Law: Agency & Employment, § 93, p. 140 (citing *Violette v. Shoup*, 16 Cal. App. 4th 611, 619 (1993), *Magnecomp Cor. v. Athene Co.*, 209 Cal. App. 3d 526, 536 (1989)).

Here, there are genuine issues of material fact as to whether Nunez had an agency relationship with Plaintiffs that "may be implied based on conduct and circumstances." *Scholastic Book Clubs, Inc. v. State Bd. of Equalization*, 207 Cal. App. 3d 734, 748 (1989); *see also Borders Online*, 129 Cal. App. 4th at 1189; *Thayer v. Pacific Elec. Ry. Co.*, 55 Cal. 2d 430, 438 (1961). For example, Paul Goldsby testified that he "made an agreement with Miguel Nunez to act as [Plaintiffs'] agent in procuring writers, show runners, and networks and various things so that [Plaintiffs] could put the [Roscoe's] show into production, and with the named actors that he had relationships with." SGD ¶ 77. Herb Hudson likewise testified that Goodness Films trusted Nunez to make an effective pitch to TV One. *Id.* ¶¶ 78-79. Portions of Kennedy Goldsby's depositions also suggest that Nunez's "role as the agent, it was to approach people, connections, for instance Mr. Weinberger, anybody of significant potential ability to get us a deal, a distribution deal." *Id.* ¶ 81.[10] This testimony is supported by an August 24, 2010 e-mail between Paul Goldsby and Nunez entitled "[R]oscoe's [S]cript," in which Goldsby instructs Nunez to "[m]ake it happen at [TV] [O]ne before bently [sic] [Kyle Evans] [g]ets a chance." *Id.* Nunez responds to this e-mail by writing, "Will do." *Id.* Paul Goldsby further indicated that if Nunez "secured a deal with one of the networks that [Nunez] brought to the table, he was *guaranteed* a position as a co-producer on the project, potentially a co-executive producer . . . and that he would be *guaranteed* a regular character on the series itself." *Id.* ¶ 83 (emphasis added).

While Plaintiffs ultimately may be unable to convince a jury that an agency relationship

---

[10]Thus, the Court cannot conclude as a matter of law that Nunez lacked the authority to initiate legal relationships with between the principals and third parties. Given the conflicting evidence on this issue, the full scope of Nunez's authority must be assessed by the trier of fact.

existed between Defendant Nunez and the Roscoe's Producers, the evidence in the record is not capable of but a single inference. *See Stilson v. Moulton-Niguel Water Dist.*, 21 Cal. App. 3d 928, 936 (1971) ("Where a conflict . . . exists from which either conclusion could be reached as to the [agency] status of the parties, the question must be submitted to the jury."). Because agency, in turn, is a relationship that imposes fiduciary obligations as a matter of law, the Court would DENY Defendants' motion for summary judgment on the breach of fiduciary duty claim.[11] The Court would also find that the evidence in the record – such as the testimony indicating that *both* Nunez *and* Weinberger agreed to take Roscoe's Show to TV One, as well as Weinberger's supposed awareness of Plaintiffs' relationship with Nunez, and Weinberger's alleged statement that "We could take [Roscoe's] to TV One ourselves, and I could write for free" (*see* SGD ¶¶ 88-89) – establishes a genuine issue of material fact as to the aiding and abetting breach of fiduciary duty claim.

### 2. The Breach of Implied Contract Claim

Defendants argue that Plaintiffs "blurted out their idea for Roscoe's Show for the purpose of entering into a business relationship with Weinberger" and thus Weinberger cannot be held liable for breach of implied contract. Docket No. 181 at 28-29. Defendants also assert that Plaintiffs never actually offered to "sell" Roscoe's Show to Weinberger or Nunez, and thus cannot prevail on their *Desny* claim. Defendants further argue that because the works are not similar and Weinberger independently created Belle's, Defendants cannot have breached any agreement to pitch Roscoe's Show to TV One. *Id.* at 30.

"To state a claim for breach of contract under California law, a plaintiff must allege (1) the existence of a contract; (2) that he has performed or that his nonperformance is excused; (3) defendant's breach of the contract; and (4) damages resulting from the breach." *Greenwich Ins. Co. v. Rodgers*, 729 F. Supp. 2d 1158, 1163 (C.D. Cal. 2010) (citation omitted). In California, a writer and producer form an implied contract where both understand that the writer discloses his idea on the condition that he will be compensated if it is used. *Desny v. Wilder*, 46 Cal. 2d 715, 299 P.2d 257 (1956). The rights asserted in a *Desny* claim, are "not the same" as the rights protected under federal copyright law, and California state courts "have recognized this consistently over the decades." *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 980-81 (9th Cir. 2011). "To establish a *Desny* claim for breach of implied-in-fact contract, the plaintiff must show that the plaintiff prepared the work, disclosed the work to the offeree for sale, and did so under circumstances from which it could be concluded that the offeree voluntarily accepted the disclosure knowing the conditions on which it was tendered and the reasonable value of the work." *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 967 (9th Cir. 2004). More generally, an "intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance." *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850, (1999) (internal citation omitted).

The Court would find that there are genuine issues of material fact with respect to Plaintiffs'

---

[11]Whether TV One would have ultimately purchased Roscoe's Show but for the purported breaches of fiduciary duty alleged by Plaintiffs cannot be resolved on summary judgment, especially given that "scripted television shows often evolve during the course of production[.]" *See* Docket No. 198 at 16-17. Moreover, even if TV One would not have ultimately purchased Roscoe's Show in its then-current form, it is not clear that Plaintiffs would have therefore suffered *zero* damages as a result of Defendants' allegedly wrongful conduct.

implied contract claim as well. Here, the parties do not dispute that, at an initial meeting with Weinberger, Plaintiffs told him about Roscoe's Show and asked him to be a potential writer and/or director for the show. SGD ¶ 103. Crucially, however, the parties *do* dispute whether it was understood and impliedly agreed – *before* Paul Goldsby provided Weinbger with an oral description of Roscoe's Show – that the materials would not be used or disclosed for any purpose unless Hudson, Paul Goldsby, and Kennedy Goldsby were compensated. *Id.* ¶ 104. While Defendants intensely dispute Plaintiffs' account of these events, at this stage, the Court cannot make credibility determinations or weigh conflicting evidence in the record.

Defendants also insist that Plaintiffs never formally offered to "sell" their work directly to Weinberger or Nunez, and thus argue that Defendants cannot be liable for breaching any implied contract. *See, e.g.,* Docket No. 181 at 27-30. This argument, however, oversimplifies Plaintiffs' claim which, they characterize as "not a classic *Desny* claim" but rather "one that is implied by conduct[.]" Docket No. 198 at 20. The implied contract alleged here was one in which Defendants were to use their talents and industry connections to help advance and market Plaintiffs' idea for Roscoe's Show, the sale of which would presumably generate profit for both Plaintiffs and Defendants. SGD ¶ 104. Defendants claim that because Plaintiffs would also compensate Weinberger under this arrangement – rather than receive compensation from Weinberger – there could be no agreement. Docket No. 237 at 26. But here too Defendants' argument overlooks at least one form of "compensation" Plaintiffs sought to receive from Weinberger and Nunez in exchange for the disclosure of what Plaintiffs perceived as their valuable and substantially developed idea: Defendants' professional connections, advocacy, and expertise in the entertainment industry. *Grosso*, 383 F.3d at 967 ("[W]here an idea is furnished by one party to another, a contract sometimes may be implied even in the absence of an express promise to pay."). For these reasons, this case is not squarely on point with *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 902-03 (9th Cir. 1987) or *Faris v. Enberg*. 97 Cal. App. 3d 309, 318-20 (1979), both of which are cited by Defendants but involved plaintiffs who, unlike here, disclosed works to defendants (1) without any prior agreement, and (2) solely to determine whether those defendants wished to enter into business relationships exclusively with those same plaintiffs. To be sure, the implied agreement here also required Defendants to engage in a kind of "business relationship" with Plaintiffs – but that relationship appears to have been only one component of the overall contract, and does not negate the purportedly additional terms and obligations.

In sum, while the implied contract claim here is somewhat atypical from a traditional *Desny* claim, the Court would find that there is sufficient evidence in the record from which a reasonable juror could conclude that an implied contract existed between the parties. *See Retired Employees Assn. of Orange Cnty., Inc. v. Cnty. of Orange,* 52 Cal. 4th 1171, 1178 (2011) (" The existence and terms of an implied contract are manifested by conduct. The distinction reflects no difference in legal effect but merely in the mode of manifesting assent. Accordingly, a contract implied in fact 'consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words.'") (internal citations omitted); *Rokos v. Peck*, 182 Cal. App. 3d 604, 614 (1986) ("[I]n California the device of the implied-in-fact contract is employed to protect the ideas of literary artists who, in the course of attempting to market their ideas, must necessarily disclose them to producers and publishers."). Defendants motion for summary judgment

-14-

on this claim would thus be DENIED.[12]

### 3. The Interference with Prospective Economic Advantage Claim

Lastly, Defendants Weinberger and Nunez argue that Plaintiffs did not have any existing relationship with actors, networks, or showrunners and that, even if Plaintiffs did, they cannot prove that Weinberger knew of those relationships or that Weinberger or Nunez knowingly interfered with those relationships. Docket No. 181 at 31-32.

The claim of interference with prospective business advantage requires: (1) an economic relationship containing the probability of future economic benefit to plaintiff; (2) knowledge by defendant of the relationship; (3) intentional acts by the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to plaintiff proximately caused by defendant's acts. *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1113-14 (C.D. Cal. 2004); *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). "[T]he broader tort of interference with prospective economic advantage does not require the existence of a valid contract." *City of San Jose v. Office of Comm'r of Baseball*, No. C-13-02787 RMW, 2013 WL 5609346, at *14 (N.D. Cal. Oct. 11, 2013).

Here, there is ample evidence that Plaintiffs had existing relationships with actors and producers slated to be involved with Roscoe's Show. *See, e.g.*, SGD ¶¶ 118-123. Moreover, Plaintiffs also had at least one promising economic relationship with Adult Swim through Aaron McGruder, whose company had a production agreement with Adult Swim. *Id.* ¶ 116; Docket No. 198 at 25-26. McGruder apparently contacted the president of Adult Swim and obtained his assent to include within his production agreement an order of 26 episodes for Roscoe's Show. SGD ¶ 116; Goldsby Depo. 117:17-118:18. While a jury may not ultimately conclude that these relationships – and the others identified in Plaintiffs' Statement of Genuine Disputes – meet the elements necessary to establish a claim for interference with prospective business advantage, the Court would find that there is sufficient evidence in the record to create a genuine issue of fact on this issue. The Court would similarly find a jury might also reasonably conclude that both Nunez and Weinberger had knowledge of these relationships. For example, Paul Goldsby told Nunez in Weinberger's presence that an actor, Keith David, was attached to the Roscoe's Show. SGD ¶ 120. Plaintiffs also adduced evidence that Weinberger was present, after active casting for Roscoe's Show had taken place, at a meeting attended by a Roscoe's Show co-producer, Frank Pinnock. Hamrick Decl., Ex. C, ¶¶ 11-14. Moreover, given that intent may be established "by inference as well as by direct proof", the Court would hold that the genuine issues of material fact set forth in Sections III(A)(1)-(2), *supra*, are sufficient to defeat Defendants' motion for summary judgment on the third, fourth and fifth elements necessary to make out Plaintiffs' tortious interference claim. *See Savage v. Pac. Gas & Elec. Co.*, 21 Cal. App. 4th 434, 449 (1993) (juries can "infer culpable intend from conduct 'substantially certain to interfere with [the prospective economic relationship]."). In the context of

---

[12] Based on the evidence in the record, the Court would reject Defendants' contention that there is no genuine dispute that Weinberger created Belle's independently from Roscoe's Show. *See, e.g.*, 3 M. Nimmer & D. Nimmer, Nimmer on Copyright (2010) § 12.10[B][2][b] ("No matter how credible such a claim [for independent creation] is, and even absent any contrary evidence, a court should not grant summary judgment on that basis . . . To the extent that defendant denies copyright and maintains independent creation, a factual issue arises which it is for trial to resolve."). *See also* Docket No. 198 at 9-10.

Defendants' extensive relationship with Plaintiffs, the Court would find that there are genuine issues of material fact regarding these elements. The Court would therefore DENY Defendants' motion for summary judgment on Plaintiffs' tortious interference claim.[13]

### C. Attorneys' Fees Under the Copyright Act

Plaintiffs and Defendants both argue that they are entitled to attorneys' fees under the Copyright Act. "Whether or not a prevailing party is entitled to attorneys' fees under the Copyright Act 'is reposed in the sound discretion of the district courts.'" *Mattel, Inc v. MGA Entm't, Inc.*, 705 F.3d 1108, 1111 (9th Cir. 2013) (quoting *Fantasy v. Fogerty*, 94 F.3d 553, 555 (9th Cir. 1996) (*Fogerty II* )); *see also* 17 U.S.C. § 505. "The most important factor in determining whether to award fees under the Copyright Act, is whether an award will further the purposes of the Act." *MGA Entm't*, 705 F.3d at 111 (citing *Fogerty II*, 94 F.3d at 558). The Act's "ultimate aim is . . . to stimulate artistic creativity for the general public good." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). "That aim is furthered when defendants 'advance a variety of meritorious copyright defenses.'" *MGA Entm't*, 705 F.3d at 1111 (citing *Fogerty v. Fantasy*, 510 U.S. 517, 527 (1994) (*Fogerty I*)).

Here, having concluded that Defendants are the "prevailing party" with respect to the copyright claims, an award, if any, would go to Defendants. However, the Court would not grant Defendants' request for fees based on the minimal briefing presently before the Court on this issue. Instead, the Court would order Defendants to file a regularly noticed motion for attorneys' fees under the Copyright Act, and would hold a separate hearing on the issue. In light of the fact that there are still outstanding state law claims in this case to be resolved, the Court would also discuss the timing of any such motion with the parties at the hearing.

### D. Plaintiffs' Request Under Rule 56(d) and the Parties' Evidentiary Objections

Plaintiffs ask that, in the event the Court "is inclined to grant any portion of Defendants' Motions . . . Plaintiffs respectfully request that the Court defer considering the Motions, or deny them, pursuant to [Fed. R. Civ. P. 56(d)." Docket No. 198 at 31. A plaintiff seeking a continuance under Rule 56(d) must show that "(1) it has set forth in affidavit form the specific facts [it] hopes

---

[13]The claim for tortious interference "requires an allegation of an independently wrongful act. In *Korea Supply Company,* the California Supreme Court defined an independently wrongful act as one that 'is *unlawful,* that is, if it is proscribed by some constitutional, regulatory, common law, or other determinable legal standard." *Comm'r of Baseball,* 2013 WL 5609346 at *14 (citing *Korea Supply* Co., 24 Cal. 4th at 1159). Here, that requirement would likely be satisfied by Plaintiffs' breach of fiduciary duty claim, at the very least. The Court would also note that, at this stage, it appears that the conduct giving rise to Plaintiffs' tortious interference claim is – at least in some respects – distinct from Plaintiffs' breach of implied contract claim. *See Sacramento E.D.M., Inc. v. Hynes Aviation Indus., Inc.*, No. 13-CV-00288-MCE, 2013 U.S. Dist. LEXIS 115791, at *22 (E.D. Cal. Aug. 15, 2013) ("Because Defendants' wrongful acts, as alleged, amount to conduct that is independently tortious, Plaintiffs claims for interference with prospective economic advantage are distinct from any breach of contract claim that Plaintiffs could have asserted against Defendants.") (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 340-41 (1997); *Crescent Wood Working Co., Ltd. v. Accent Furniture, Inc.*, No. EDCV 04-1318 RT (PJWx), 2005 WL 5918848, at *6 (C.D. Cal. Aug. 10, 2005)). Suffice it to say that, given the uncertainty as to Defendants' ultimate liability on their state law claims and the genuine issues of fact identified herein, the Court cannot resolve the tortious interference claim as a matter of law.

to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose" the pending motion. *Family Home & Finance Center, Inc. v. Federal Home Loan Mortgage Corp.*, 525 F.3d 822, 927 (9th Cir. 2008). Given that the Court has granted solely Defendants' motion for summary judgment on the copyright claims, the Court would DENY Plaintiffs' request under Rule 56(d): Plaintiffs have not explained how there are any additional facts that could be relevant to the Court's holding regarding substantial similarity between Belle's and Roscoe's Show.

Finally, the parties have filed various objections to the evidence offered in support and/or opposition to the present motions. *See, e.g.,* Docket Nos. 204-205, 229-234. Many of those objections are either moot or irrelevant due to the Court's holdings in the instant Order and, in any event, the admissible evidence in the record is sufficient to create genuine issues of material fact regarding the state law claims discussed above.

## IV.  Conclusion

In sum, Defendants' motions for summary judgment would be GRANTED IN PART and DENIED IN PART.

Defendants TV One, Weinberger, and Nunez's motions for summary judgment with respect to Plaintiffs' copyright claims would be GRANTED.

Defendants Weinberger and Nunez's motions for summary judgment with respect to Plaintiffs' claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of implied contract, and tortious interference with prospective economic advantage would be DENIED.

-17-